oral argument not to exceed 30 minutes per side. Mr. Lindstrom, for the appellants. Good afternoon. Good afternoon, Mary Lindstrom. On behalf of the people of the state of Michigan, may it please the court, as Justice Kennedy explained just a few months ago in Schuette v. BAM, it is a fundamental premise of our democratic system that the people can be trusted to decide even divisive issues on decent and rational grounds. And that's what this case is about. It's about who gets to decide what the definition of marriage is, not what that definition must be. And it's about who gets to decide on two different levels. Within the judicial hierarchy, it's about whether a district court can disregard a directly on-point holding by the United States Supreme Court, namely Baker v. Nelson. And the bigger picture, it's about whether federal rights, if there's going to be the creation of a new federal constitutional right, if that should be done through the amendment process or by the courts under the substantive due process doctrine. So there's common ground in this case that the U.S. Constitution does not directly address same-sex marriage, which means to turn to the question of substantive due process. The relevant test is whether or not the right that's being asserted is objectively, deeply rooted in this nation's history and tradition, and implicit in the concept of ordered liberty, such that you can't conceive of liberty or justice without it. And same-sex marriage does not have that necessary historical deep root. What do you do about the fact that one could have said the same thing about Lawrence? Well, with respect to Lawrence, the Lawrence court didn't directly address the Glucksberg analysis. But since then, this court has repeatedly applied the Glucksberg analysis and recognized it's a continuing way that you're supposed to analyze substantive due process, both in the U.S. Citizens Association case and in Blau. So repeatedly since Lawrence, this court has continued to apply Glucksberg and has recognized that that still sets out the relevant standard. Lawrence doesn't override Glucksberg or reverse all of the cases before it that set out that same type of test simply by not mentioning it. So this court is still bound by it and by this court's precedent applying Glucksberg post-Lawrence. What about Baker? You mentioned that early on. It's not a very long opinion, I think you'd acknowledge. A lot has happened since then. I think you'd also acknowledge that. So how do we deal with it? Well, this court, I think, is bound by it. The length of it doesn't matter because the question is a question of hierarchy, not stare decisis. The United States Supreme Court has repeatedly said that summary decisions that it makes are binding on the lower courts. There are merits determinations, and this court has reiterated that. For example, in the Song v. City of Elyra case, it specifically said that summary dispositions are still binding unless reversed by the United States Supreme Court. Well, there's a little more give and take in it than that. The doctrinal developments, the doctrine that has grown out of other Supreme Court cases, we're clearly dealing with some doctrinal developments in this area of the law, are we not? Well, I guess two answers to that. First of all, the doctrinal developments language that's mentioned in Hicks also says that courts are supposed to follow the Supreme Court's decisions until it overrules them. Subsequent to that, in Augustini v. Felton and Rodriguez, this court has also made this point. It's up, if a decision in the Supreme Court appears to rest in the line of cases that has been overruled, it's still up to the Supreme Court to override it. But I disagree on the doctrinal developments point, too. For example, Romer doesn't do anything to undermine the fundamental rights aspect of Baker v. Nelson. Both questions were presented in Baker v. Nelson, whether there was a due process right and also whether there was a protection. So you don't think Lawrence overruling a case that came out just a few years before that indicates a doctrinal development? I think that shows a doctrinal development in the area of the right to privacy, but I don't know that that necessarily shows a doctrinal development in the area of the fundamental right to marry, which is a public recognition of something. It's not a right to privacy. So I think Lawrence has decided on a different substantive due process ground, and so it doesn't have anything to say about the fundamental right to marry. What about the Loving case suggests that the policy and the laws against miscegenation were not deeply rooted in our American society, and yet that went by the by? Well, the Loving case was primarily about the fact that there was racial discrimination and violation of the Equal Protection Clause, which the Supreme Court in Loving recognized the primary, the core component of the 14th Amendment is to end racial discrimination. So the fact that it was racial discrimination was... But it was, was it not, the law across a huge swath of southern states at the time. I mean, that was a vote by the people of many states against the possibility of interracial marriage. And the language in Loving says the right to choose whom to marry is a fundamental right. Well, to the extent that there's an attempt to analogize Loving to the question of same-sex marriage, the Supreme Court rejected that express analogy in the Baker case. So just as a matter of what the Supreme Court has previously done, even if... So really what you want us to do is take an 11-word opinion and knock out all the efforts to, all the opinions that have come out involving same-sex marriage in the last 10 years, 11 years. It hasn't been that many. The First Circuit, for example, recognized it was bound by Baker. There have been other courts that have recognized they've been bound by Baker. So that's a simple question of judicial hierarchy. But with respect to the Loving analogy, the Supreme Court, if the Supreme Court wanted to say that the freedom to choose whom to marry was not limited to someone of the opposite sex, then in Baker they had the opportunity to do that. And they didn't do that. That question was directly presented to them. So that shows that there's a difference between race, which does not go to the heart of what marriage is, versus... But you would have to concede that there were, in terms of what the electorate wanted, the Loving decision went against what the electorate wanted in much of the South when it was announced. I think it did not. I mean, when you talk about the electorate wanted, the electorate passed the 14th Amendment to end racial discrimination. So the electorate wanted to end racial discrimination. You might be interested in knowing that as recently as 1978, the Tennessee Constitution provided, quote, the intermarriage of white persons with Negroes, Mulattos, or persons of mixed blood descended from a Negro to the third generation inclusive, or their living together as man and wife in this state is prohibited. The legislature shall support this section by appropriate legislation. In March of 1978, the Tennessee electorate was asked to repeal that provision in the Constitution. And they did so, but they did so by a margin of only 8,000 votes out of almost half a million. I think these points show that the people did choose to try to end racial discrimination in the 14th Amendment and then did also choose later to end racial discrimination. But that just shows that the people can make decent and rational decisions. It doesn't mean that the history and tradition of this court with respect to the issue here, which is same-sex marriage, I think if you look at Windsor, it is very instructive on the historical analysis. Section 3 of Windsor talks about the history and tradition of marriage and separately talks about the history and tradition of same-sex marriage. And with respect to same-sex marriage, it recognizes that it was only until recent years when that was even deemed possible. Well, that's true. But if we take this case to be about the right to marry and not the right to marry a person of the same sex, isn't what's going to happen around the country pretty clear and what is happening pretty clear? If what you're saying is that there are trends where the people are passing laws to change the law, that shows... No, no, that's not what I'm saying. I'm saying what is the issue? Is the issue the right to marry here or are we dealing with the right to marry or are we dealing with something like, oh, what were those cases? The right of inmates to marry, the right of dads to marry. I mean, I think it was Judith Kaye that said fundamental rights are fundamental rights. Simple as that. Well, for example, if you're looking at whether there's deep historical roots within the definition of marriage that only people who are not behind their child support payments can marry, that's quite different from saying that there's a deep and historical root that only people of the opposite sex can marry. So for substance of due process, those cases involved limitations that were not deeply rooted. They were not inherent to what marriage had been throughout the centuries. And again, the U.S. Supreme Court recognized this when it was talking about history and tradition in the Windsor opinion. It said marriage between a man and a woman has for centuries been recognized as fundamental. So the Supreme Court was talking about the fact that marriage has been defined as being between a man and a woman as fundamental to the very definition of the term. And it said that that was true to the definition of the term and to its role and function throughout the history of civilization. What do we do about, I think, a reality that marriage is always about changes with social mores. And maybe originally marriage was about encouraging procreation, channeling procreative possibilities. But modern conceptions of marriage are more about love, affection, and commitment. And when you think of it that way, it does seem a little harder to justify even on rational basis grounds because everything you're talking about so far is not being a fundamental right. That doesn't answer the question that really was the holding in all four of these cases, that it doesn't even survive rational basis review. What do you do about the difficulty of, if you think about marriage just through that lens, love, affection, commitment, it does start to get a little difficult to see the difference between the one group eligible and the other group not. Well, I agree. When you focus on fundamental rights, history is the focus. When you're under the equal protection analysis, it's whether there's a rational basis. And so the question is, I guess the preliminary starting question for the rational basis inquiry is, why is the state interested in marriage in the first place? Why is the state interested in emotional connections between people? As we discussed this in our brief, the state doesn't have an interest in regulating friendships, doesn't regulate how many people can be in a friendship or how long the friendship has to exist. The thing that changes, and the reason the state has an interest in marriage, is because marriage is linked to children and to the bringing of new children into society and how is society going to make sure that they're cared for. So it's rational for the state to have an interest in promoting marriage so that it will be more likely that a child will have both a mother and a father and will have the benefits of having both a mother and a father. Remember, in the trial below, the experts on the plaintiff's side conceded that there are differences between mothering and fathering and that there are different benefits from each one. What is the rational basis, though, of excluding everybody else? It doesn't cut down on the procreation of children, interfere with the procreation of children, just because you've got two people of the same sex marrying, and in some of those marriages at least one of the partners is able to procreate. I have three merits responses to that, but first I have to point out that under the rational basis standard of review, that's flipping the question. The Robeson case lays this out very clearly by the United States Supreme Court where it points out that the question for rational basis review is whether the state interest that's being put forward is, if it's being advanced by including a first group, then including a second group that does not advance that interest, it's not irrational to not extend benefits. So that case, again, was about veterans' benefits. The question the state interest asserted was having people to fight in the armed services, and the benefits were extended into benefits to encourage people to join the military. And the question was, do conscientious objectors, are they entitled to these benefits? Extending veterans' benefits to conscientious objectors would not advance the state's interest in making it more likely to be people to fight in the nation's services. So you would say that what we're trying to do with the confining marriage to opposite sex partners is to encourage procreation? I think that is one of the state's interests is making sure that procreation, for one, occurs in long-term committed relationships between opposite-sex couples where procreation apparently happens. Well, isn't it a little hypocritical then to allow people to marry who can't procreate but prevent same-sex partners from marrying? Not at all, Your Honor, because the question of whether the state would have the ability to say to an opposite-sex couple when they're applying for their marriage license, are you going to procreate, the definition of marriage has always recognized that opposite-sex couples have the right to marry. So that would be a limitation on the fundamental right to marry. So you wouldn't even get to the equal protection question, right? Mr. Lindstrom, you would acknowledge that there are benefits, important benefits to the state beyond procreation, I should think. The benefits and responsibilities attendant to marriage seem to bear on the question we're addressing here is whether or not those matter to a state that says, as Virginia did, we have no interest in licensing adult love. But there are these benefits and responsibilities that would be important to the state. The taxes, somewhat consistency among the members of the married members, folks in marriages throughout the state all would have the same responsibilities, those sort of things. I think there would be other benefits from people staying together. There may be multiple state interests. The question here is whether it's at least a rational state interest to try to make it more likely that every child would have both a mother and a father, or whether it's at least a rational state interest to try to recognize that as a biological reality, opposite-sex couples can have unplanned pregnancies, whereas same-sex couples can't. So extending marriage to opposite-sex couples addresses that concern. Extending it to same-sex couples doesn't. So there's at least a rational basis, which is all that's necessary. There are other benefits from marriage, but the fact that that doesn't undermine that it's rational for the state to be promoting this marriage are these benefits. As everyone acknowledges, recent cases have not applied pure rational basis review. We know that from Windsor, for example, the focus was different than rational basis review. Well, Windsor, excuse me, Romer, and then Windsor, Romer starts out by talking about the conventional inquiry of rational basis review, and it cites Heller, and then it talks about whether or not there's a bare desire to harm. So Windsor does the same thing by citing Romer, requiring a bare desire to harm in order to set aside the rational basis. If there were a bare desire to harm, you might be able to tell that if there was no rational basis. But here there are rational basis, so there's no reason to fall back on the bare desire to harm. Instead, the presumption should be the one I started out with, that voters are decent and rational, and that if there is a plausible, I mean, that's what the rational basis test is. If there's a conceivable basis, then that's a reason to uphold the law. And this is a democracy-promoting rule. It allows the people to make these decisions. Remember, this is something that the people could decide to change tomorrow by amending the federal constitution. It's not that the court is the only recourse for creating a new right. In fact, the court shouldn't be creating new rights. The third rational basis that I haven't brought up yet is the fact that there is uncertainty in this area. It's simply such a new thing that it's too early to tell. Again, the plaintiff's experts conceded that trying to study children that were raised in same-sex households is a needle in a haystack population. And they also conceded there hasn't been a single comprehensive study that's been done of children who were actually raised in a same-sex marriage. So a rational person might think, even somebody who would vote in the future for same-sex marriage, a rational person might think it's too early to tell. And it's at least rational to wait and see. So there's a number of different rational bases. So you were starting with fundamental rights. We've been talking about rational basis review. If you get to strict scrutiny or intermediate scrutiny through one path or the other, would you concede the state has a problem? No, Your Honor. It would also depend on which analytical framework you got to intermediate scrutiny under. So first, if it was intermediate scrutiny under the Equal Protection Clause, setting aside the fact that this court has three precedents that restrict it from adopting heightened scrutiny for sexual orientation, even if those weren't there, under intermediate scrutiny, biological differences between men and women can make a difference. So, for example, in the Wynn v. INS case, which is about the difference between mothers and fathers who had children that were born outside the United States, the United States Supreme Court upheld under intermediate scrutiny a distinction that treated men and women differently and required men to prove to a higher level degree that they were the father than it required women to prove when they brought a child back into the U.S. So it's possible to survive under intermediate scrutiny. And I guess the other question is, under the Equal Protection Clause still, this is simply a disparate impact case. The law is facially neutral, and also there's no intent to harm. The District Court in Michigan's case specifically recognized that it wasn't possible to say that there was an intent or an animus on the part of Michigan voters. So that means the only thing that's left is disparate impact. And under Washington v. Davis, even if this were a race... How is it facially neutral? It's facially neutral. To define marriage as including one group but not another? By defining marriage to be between a man and a woman, it's not discriminating against... It's facially neutral as gender-wise. I understand that. I agree with that. But I don't understand why it's facially neutral as between people of one sexual orientation and another. Well, I think the answer would be that it doesn't prohibit them from marrying either. And so I think it's facially neutral. There's no evidence that this was done to try to exclude them. And the evidence is that it was simply continuing the definition that had been throughout all of Michigan's history. So the only reason, I mean, I guess that's the answer. So can I ask you, you mentioned the Sixth Circuit precedents. I assume you're talking about Davis? I was referring to Davis and Scarborough and Equality Foundation, yes, Your Honor. Yeah, well, you know, the problem with Equality Foundation is, as I read it, it depended on, it relied upon the Supreme Court's Bowers decision, which was reversed in Lawrence. So I wonder... Your Honor, the Equality Foundation opinion mentions Bowers only when it's talking about prior history. And then it's based on Romer. It was remanded in light of Romer, and its analysis is under Romer. So it doesn't rely on Bowers. The analysis doesn't talk about Bowers. And, again, this court, even after Lawrence, has continued to apply the same Glucksberg technique. Well, I have to tell you, we are sometimes perfectly capable of blindly applying cases. I'm not sure I would be willing to say that we did in Davis, but that has happened. So, you know, there's... If you were to lose under either, you know, one possibility is there's a constitutional right to same-sex marriage. Another possibility is there's heightened review, which makes life very difficult for justifying the law. Are there practical implementation problems? I mean, you know, with Brown, you could say the only implementation problem was resistance, but it was a pretty easy rule to implement, right? And I guess what I'm interested in, from the state's perspective, is this... There may be controversy, there may be resistance, but why is it difficult, as a matter of implementation, to implement this new rule? So if, in other words, the outcome were that same-sex marriage is constitutionally protected, would it be hard for the states to implement same-sex marriage? Yeah, but what problems result? Like I said, I think if you're talking about what possible harms might come from changing the definition of marriage... I'm thinking of implementation problems. Are there... Is it difficult to adjust state laws on marriage, divorce, anything else, or is it really pretty simple? You just now include this new group within the... It would have widespread impacts. I'm not quite sure exactly how all of those would play out. What would they be? That's the question. What would they be? Well, as far as changing how all of Michigan's laws about marriage work, I think in the big picture, one of the things that could happen if it were changed is this is something that there would be no institution in Michigan that would say it's important to have both a mother and a father. So in terms of societal impact, I think there might be harms, which is to say that there would be nothing to say that it's important for fathers to be there and mothers to be there, and mothers and fathers bringing different things to the table. Do you honestly think that's what's happened in the states where same-sex marriage is now valid? I think it's too early to tell, Your Honor. It's only been 10 years since the first state passed it. But we're now to something beyond 25% of the jurisdictions in the country, and probably more than that in terms of... maybe more than that in terms of population as a whole. And it doesn't look like the sky has fallen in. I think the point is that it's too early to tell when you're changing such a fundamental bedrock of society with just 10 years. That's not even a single generation of children. So I don't see how it could be possible to assess the outcome on children. Well, I thought there was a lot of evidence offered at the trial in Michigan that indicated, in fact, that the outcome on children was reasonably benign, given what they know at this point. And I know you're going to say, I see it coming, it's too early to tell. I am going to say that. I think that's a valid point, Your Honor. But then the people who tried to come in on your side of the trial and present all these terrible impacts that they said this would have, I mean, there was even the Texas professor where they had a disclaimer on the University of Texas website saying, don't believe anything this man says. Well, Your Honor, the fact that one particular social scientist... I think the big picture is it's simply too early to tell. This was something rational people could agree with.  It's too early for social scientists or philosophers or historians to be able to tell. The amicus brief by... Isn't the bigger point, Mr. Lindstrom, that it disparages the votes of citizens of Michigan? I should think that's... I definitely think that weighs into the consideration very heavily. To say that, for example, this is under rational basis review to say that Michigan's voters didn't have among them, out of all 2.7 million of them, a single rational basis means it's not possible to have a person of goodwill to disagree in this. You're talking to a panel with two people from Ohio. We might be able to accept that argument. Well, fair enough. So I think the numbers in Ohio are also quite... You might be more sensitive to talking about Ohio. Your red light is on. Aren't the... Let me just ask one question. The dates of the last time the people in Michigan voted were something like 10 years ago? It was 2004. That's correct, Your Honor. That's a reason that the people could change their mind in the future. It's not a reason to say it's unconstitutional. Okay, you'll get your full rebuttal time. Thank you. The next one is from Ms. Stanier. May it please the Court. Carol Stanier on behalf of the DeBoer-Rouse family. For 50 years, the Supreme Court has recognized that the freedom of personal choice in matters of marriage and family life are liberties protected by due process. April DeBoer and Jane Rouse have a constitutional right to share a life, to marry, to form a family, to raise their children. We show in this case that no matter what standard of scrutiny the Court uses, no matter what doctrine the Court applies, the state can't prevail here. The Michigan Marriage Amendment is unconstitutional. A starting disagreement between the parties, as the Court has already observed, is the articulation of the right itself. Is it the right to marry, or is it the right to what the state is calling same-sex marriage? What about, I mean, I realize the, you know, before Windsor the First and Second Circuits said Baker's binding. Post-Windsor, there's no majorities recognizing that. But I have to say, I really find that a very serious issue. And I, the thing that's going on is you, oddly enough, we treat these summary reversals or summary affirmances as binding precedent, no less than a fully written opinion. That's kind of, everyone understands that's true. There's this language that Judge Daughtry pointed out, doctrinal developments. That's mainly from a 75 case, Hicks. It's not clear what Hicks means because it then later says, you know, follow this until we tell you otherwise. But then in American Express and Agostini, I mean, the Court is pretty clear about saying even when you see one line of cases crumbling, you, the lower courts, aren't allowed to infer and anticipatorily overrule this other line of cases. So just, I guess, really as a matter of hierarchy, aren't we stuck with Baker? I don't believe so. This is a one-line summary affirmance order. It binds the Court unless there are doctrinal developments that are subsequent. We believe that Romer, Windsor, Lawrence, and even Frontiero constitute that doctrinal development. The Agostini case was a... When you say doctrinal development, is it fair to paraphrase that to mean reasoning that's inconsistent with other lines of precedent? Isn't that what you mean by a doctrinal development? Well, there's evolution of these concepts, evolution of due process concepts, evolution of equal protection in Lawrence. And I think the Court, the First Circuit... That is increasingly inconsistent with Baker. That's your point, right? Legal reasoning and other cases that seem somewhat inconsistent with Baker. It's totally inconsistent with Baker. Okay, but isn't that Agostini? Isn't that exactly what was going on? Agostini is distinguishable. Agostini was a full opinion that had written opinion, it had oral argument, and it had a conclusion. And the distinction between a summary affirmance and that type of situation is the fact that in a summary affirmance order, you don't know what the rationale for the Court is. It's an 11-word order. You don't know what the rationale is. You don't know what the Court-based it's ruling on. And that's what's distinguishable about these types of rulings. I think that's why summary affirmances aren't binding on the Court, the Supreme Court. That's why they're very casual about ignoring them. But I didn't think that rule applied to lower courts. The Second Circuit in League of Women Voters of Nassau County explained that lower courts can be informed directly by an outright reversal of an earlier decision, or they can be informed indirectly by doctrinal developments. So they held, or what we would say, is that here the doctrinal developments are the way that this Court is informed, and therefore this Court can make the call, you know, this Court can make the call despite Baker. And every court in the country has ruled this way on Baker. That wasn't true in the First and Second Circuit, before Windsor. Before Windsor. Windsor is doctrinal development, and probably the most doctrinal development that we have, because it at least is a recognition same-sex marriage case. So it's the greatest, I would argue, doctrinal development case. Lawrence and Romer were doctrinal developments, too. I mean, I think you rely on those cases. We do. And that didn't alter their view of how to look at this? It didn't alter the Sixth Circuit's view? The First and the Second Circuit's view before Windsor. One of those cases was Windsor itself. I understand that. The Court in Perry certainly... Let me do it this way. The Supreme Court had that issue before it. There was a discussion on the record with, I believe, Justice Ginsburg talking about doctrinal development, and the Court didn't think anything of that argument. Now, granted, they decided that case based upon standing, but the Court doesn't think much about that. They didn't even mention Baker. It didn't even talk about it. And the Court allowed California's ban to be struck down. Well, it would have been pretty strange for Windsor to say anything about Baker, given that the companion case to Windsor is Hollingsworth, and they decided there was a jurisdictional impediment to getting to the issue presented in today's case. I understand. I understand what the Court is saying. I think in this case, this Court can reach it because there's been doctrinal development. I guess I don't have anything beyond that. I think I understand the argument. We are not asking to redefine the marital relationship. We are only asking for an end to the exclusion of same-sex couples from the right to marry. Due process focuses on the attributes of the right itself, not on the class of persons. Counsel, when you're talking about getting that right, it requires state licensing. That's what your clients want. They want state, yes. State license their relationship. That's correct. And the right to marry, yes. Okay. Well, the import there is something different than I thought you were talking about. You want them to recognize it and to license it by the state to license it. We do. The central attribute of marriage is the freedom to marry the person of your own choice. The state cites Glucksberg that the Court must make a careful description of the fundamental right asserted. But there's a long history of decisions defining that right at a broader level of generality, Loving v. Virginia, Turner v. Safley, and Zablocki. So let's say, take the Loving point. I mean, that's a 1967 decision. So in 1968, say, a gay Caucasian man and a gay African American man go to Virginia to seek a license to marry. Do you really think Loving controls that case in 1968? Well, I think the Court, by citing Loving in Windsor, thinks that there's not much difference between marriage by a same-sex couple and marriage by an interracial couple. No, they didn't decide the case, but they cited it. So I think that the trend is certainly in that direction. And I think the Court... Trend lines are different from saying what Loving stands for. Isn't the answer to my question about what happens in 1968 pretty obvious? Because we have Baker in 73. I think that Justice Kennedy tells us something about how the Court may be viewing these cases. And I think what he's saying, and I think you see it in Lawrence, and you see it in Windsor, and the Court is saying that back decades ago, certain practices were accepted. And now we understand more about these things, and we now understand that these are now going to be framed as discriminatory. We didn't know anything about same-sex couples back at the time of Loving. We didn't know anything about... And they were hiding. These people were hiding. They were hiding because their conduct was criminalized. So I think to say that would this have... Would the argument have held water back in 1967? It was a different time. What about... I mean, I know that there's many significant benefits, some of them monetary, that get extended to same-sex couples if you win here, and I think that's significant. But I have to believe, based on the briefs, that the most important thing is respecting dignity and having the state recognize these marriages the same way heterosexual marriages are recognized. And if respect and dignity are critical or the key elements here, maybe it's just something I'm missing, but I would have thought the best way to get respect and dignity is through the democratic process, forcing one's neighbors, co-employees, friends to recognize that these marriages or the status deserves the same respect as the status in a heterosexual couple. So it's just funny to me why the democratic process, which seems to be going pretty well, nothing happens as quickly as we might like. But I'm just curious how you react to that point. The Michigan Marriage Amendment gutted the democratic process in Michigan. Voters can no longer appeal to their legislators. Secondly, the usual deference to the legislative process evaporates if there's reason to infer antipathy. Vance v. Bradley, beach communications, and there's plenty of reason to infer antipathy here. You have historic discrimination, persecution, criminalization of same-sex conduct throughout history. But aren't you optimistic that Michigan voters, if another initiative were put in front of them, it would certainly be a different vote, and it might well be a different outcome even today. Well, the practicality is that the Michigan voters, in order to get this before them, you would have to come up with the signatures of 10% of the total number of voters that were in the last general election. It's very cost-prohibitive for a disfavored minority to be doing that. But secondly... The goal is to change hearts and minds, which I have to believe is one of the key goals. Isn't it worth the expense? I mean, and don't you think you're more likely to change hearts and minds through the democratic process than you are with a decision by five justices of the U.S. Supreme Court? Fundamental constitutional rights may not be submitted to popular vote. They depend on the outcome of no election. That's the holding of Barnett from the Supreme Court. My question is assuming you win. My question is assuming you can win on this. I'm asking you a question. Why do you want this route? It's not 100% obvious to me why it's the better route. It may be the better route for your clients, and as a lawyer you have to keep the focus on that. But it's not 100% obvious to me it's the better route for the gay rights community. That's not obvious to me. I'm not at all optimistic that we could get that in Michigan. But secondly, in Frontiero, the government made that same argument. They said, well, just wait for the passage of the ERA. That will be better. That was 1973. We would still be waiting now. There is injury. The ban brings injury here. Marriage provides unparalleled social, legal, and personal meaning. Commitment. Mutual reciprocal responsibility. Dignity. It is security. It is a status. It is stability. But the plaintiff's losses go well beyond a deprivation of the right to marry. Michigan's laws are pervasively discriminatory to same-sex couples. They are destabilizing to these families. This is something that I think all parties agree during this trial. April DeBoer is a legal stranger to her sons, and Jane Rouse is a legal stranger to her own daughter. And the ban also brings the loss of important economic resources. We've listed all those. The ban brings psychological injury. We had Dr. Brzezinski explain that no matter how competent, how devoted, how caring that second parent is from the child's perspective, some children will suffer from an ambiguous, socially unrecognized, seemingly non-permanent relationship with the second parent. And a majority of the Supreme Court added more in Windsor, these bans humiliate children. They devalue same-sex couple families in comparison with their opposite-sex counterparts. The bans bring shame to these children. And the injury is especially unjust, especially cruel for our plaintiffs. A NICU nurse, an emergency room nurse, taking in the babies that were left behind, a premature infant in an incubator struggling to live, special needs children, hard-to-place children, children of color, foster children, they took them in. These arguments would seem really powerful if you get heightened scrutiny and maybe dispositive, but do they suffice if it's rational basis review? Well, under rational basis, we think the Marriage Amendment flunks under rational basis, and the test there would be it requires a connection between the state's articulated purpose and the law itself. And that connection is missing here. First of all, the mother-father rationale. The ban, as Judge Jotri indicated, is not increasing those mother-father families. It's not deterring same-sex couples from marrying, from having children, from raising them responsibly. But, I mean, rational basis review allows under-inclusive and over-inclusive laws. I mean, that's really the whole point of it, that the legislature can address a problem one step at a time, and the fact that it's over-inclusive or under-inclusive, that's what the court means when it says improvident decisions will eventually be corrected through the democratic process. It seems like that's your point here. It's under-inclusive. If you care about children, you should care about the children in these marriages. If you care about love and affection, you should care about these couples. They're just as capable of love and affection as the others. But that's just not how rational basis review works. Well, in a series of cases, the court struck down laws outlying what the court calls invidious under-inclusion, cases striking down laws that are, quote, riddled with exceptions, striking down laws suffering from that misfit classification that identify a purported state interest. But those were unprecedented laws. Windsor and Romer were unprecedented laws. And if there's one thing we know in this case, this definition, for better or worse, is not unprecedented. Well, I think that to the extent that the court considers this a one-factor test now, let's just assume for the purposes of argument that the test is whether it's unprecedented in the sense of never allowing same-sex couples before, whether or not it fits the Romer-Windsor characterization. I don't agree that it is a one-factor test. What I see the court doing is looking at these laws in full context, a number of factors, using a more totality of the circumstances approach. It matters that these are intensely personal rights as opposed to, say, the Vance v. Brady beach communications economic interest. It matters that this was a constitutional amendment, and I'll distinguish that in a moment. But, I mean, one of those rights, MERGI as an age discrimination case, it's a very personal right. It's saying police officers have to retire at age 50. On the theory there's a correlation between age and physical fitness. Of course, that's a ridiculous law in terms of over-or-uninclusiveness because you have 50-year-olds doing triathlons. But the court still upheld the law, and I'm sure it was deeply offensive to 50-year-old, 51-year-old police officers who were more fit than their 40-year-old colleagues. But that just gives you a sense of how tough it is to get through rational basis review or overcome it. The rational basis standard is not a toothless one. In Jimenez's case, Social Security to some illegitimate children, not others. Eisenstadt, contraceptives to married but not unmarried persons. The courts called that in rational basis review invidious under inclusion. Merino, only hippies were denied food stamps. All of those were rational basis cases. The state talks about the Robeson case, Johnson v. Robeson, saying that the state only needs to show that the inclusion of the included group furthers a legitimate interest of the state. But the state is misreading that case. The court found that the line drawn there rationally distinguished between the two groups, that there was good reasons why conscientious objectors could be denied veterans benefits while veterans could not. The court found that the groups were not similarly situated with respect to those benefits. In Cleburne, the law failed rational basis because, quote, the purported justifications for the ordinance made no sense in how the law treated others similarly situated in important respects. And here, this is the problem that we have with the biology rationale. Michigan has a robust policy of adoption. It allows single gay and lesbian people to adopt. In Michigan, adoptive parents have the same legal rights as biological parents. Michigan allows donor sperm. It allows artificial insemination. So the ban doesn't logically further any of those ties. Remember, cases are struck down under rational basis that are riddled with exceptions. So the ban doesn't logically fit that rationale. Tying procreation to marriage. Again, another disconnect. People can marry without having children, and people can have children without being married. Inmates, the infertile, the voluntarily childless, they can all marry. An equal protection constitutional law doctrine distinguishes between marriage and procreation. In Griswold, a contraception case, the court found that married persons have a constitutional right not to have children. In Skinner, as far back as 1942, habitual criminals can't be subjected to forcible sterilization. Again, not a marriage case at all. The right to procreation. What about the problem of unintended pregnancies? With unintended pregnancies, there's another disconnect. Again, it's the same problem. With procreation, the ban doesn't do anything to disincentivize heterosexual couples from marrying. Marriage gives them that already. So the ban doesn't do anything to take it away. So this idea of accidental procreation, it's really a non-rationale because there's a disconnect there between the purported purpose and the classification or the law that is in place. The right to procreate is clearly independent of the right to marry. Justice Scalia said that in Lawrence. And the bottom line is, while many persons within marriages do in fact procreate, courts cannot require procreation as a precondition to a constitutional right. The state is now arguing as a factual matter, which is a different argument than we faced in the district court, that the voters must have believed that the mother-father families are preferable. That claim is based upon irrational speculation. It's based upon disproven irrational speculation. The social science consensus answer, that's not what matters. Parents are important as people. Two parents bring double the resources. The parent-child relationship matters most. The relationship between the two parents matters. And please notice, in the district court, the state fully engaged in this trial process. They offered expert trial testimony from Dr. Regnerus on the mother-father rationale, on the biological tie rationale. They don't even summarize those witnesses before this court. Can I ask you a question about pacing, which seems to me to be at the heart of this, at least one way of looking at it. I saw a statistic in one book, I think it's Michael Klarman's book, that said in 1985, 25% of Americans knew someone who was gay. And by the year 2000, it was 74% of Americans knew somebody who was gay. And when you see that statistic, you realize social science statistics have nothing to do with this. All this change is a result of the concrete trumping the abstract. Knowing gay people, knowing they can have great relationships, be great parents, and so forth. And what's a little odd to me about the plaintiff's positions in these cases is it doesn't show much tolerance for democracies sometimes being a little slower than we'd like. I mean, we have 21 states, including the District of Columbia, one way or another now recognizing gay marriage. And we have a lot of other states that I suspect are pretty close. And some other states that would probably take a little longer. But the change doesn't have to do with social science. The change has to do with people knowing one another and seeing there's no reason for these distinctions. And it's just odd to me that the Supreme Court chose not to deal with this issue two years ago. That's something of a pacing decision. It stayed its hand. It stayed all these decisions. It's something of a pacing decision as to when the right is recognized. And I guess it's just odd to me that state legislatures don't get a little bit of the benefit of the doubt in terms of when the pacing is right for them. Again, in Michigan, it doesn't matter what the legislators do anymore. It's a constitutional ban. I think four of the states did this through initiatives. In other words, four of the states came out the right way from their client's perspective through initiatives. So initiatives are just as effective as legislation on this point. Ours would have to be repealed, and we've talked about that already. But in addition, Judge Friedman found that the Constitution is for the here and now. This court doesn't have the luxury of dodging a constitutional challenge. And I understand that the court in Perry didn't decide the ultimate question. The court looks to be telegraphing in Windsor in terms of some doctrinal change. And if the court was intending on telegraphing, it worked. Twenty straight decisions where bans have been struck down. So I think the Constitution is for the here and now. Sometimes the federal courts wait until there's a little bit more of a majority of states. So all you have are outliers, five or ten outlier states, and that's when the Supreme Court steps in. Well, I don't know about numbers, and I don't know how many were in line when the court decided loving, but we are the flyover states. We are Tennessee, Michigan, Texas, and Ohio, and nothing has been happening to help gay and lesbian people for decades. And on the coast, things have worked, and that's wonderful. The Cincinnati Charter was repealed. That's one urban area. I can tell you in my state, nothing is happening to help gay people. In terms of the science, you talked about that. The science is not nascent. This is a consensus born of 30 years of research on same-sex parenting, 50 years of research on child development. And we learned from the state's own expert that the government and large universities have stopped funding in this area on this topic because of the social science consensus. The wait-and-see approach is not itself a rational basis. It's not even a reason at all. There's another invidious under-inclusion problem with the state's child outcome rationales. No other group in society has to pass a parenting competency test before they're allowed to marry. There are groups of parents in society that we know tend to have children with poorer outcomes on average, parents who have low incomes, parents with lower educational levels, parents who marry, have children, get divorced, want to marry again. There's no competency test for these parents, but we don't bar them from marrying, nor do we bar them from having children. An argument has been raised that a decision striking down the ban would intrude upon religious freedoms. But marriage is a civil institution. Judgment for the plaintiffs will not require any change for religious institutions. They would be free to practice their sacraments, their rituals, their traditions as they see fit. And just like the Tenth Circuit in the Kitchen case, this court can specify that no religious clergy will be required to solemnize a marriage in contravention of his or her own religious belief. Religious conflict is not a basis for denying fundamental rights. If and when the case is presented to this court alleging a religious conflict, the court would have to balance competing constitutional rights the way it always has. Again, Marbury v. Madison requires the court to do this. You would look at the hierarchy of rights, look at the level of the intrusion here, it's great, and the court would render a decision. We've also alleged that intermediate scrutiny applies here because plaintiffs as gay and lesbian persons qualify for quasi-suspect class status. We renew that argument here, and we defer to our brief and to the wonderful brief of the constitutional law professors that intermediate scrutiny would apply here based upon quasi-suspect class. Just briefly, we believe that Equality Foundation can be revisited by the panel. It does not require an en banc decision because there is an inconsistent decision, Equality Foundation was, inconsistent with the Supreme Court that requires modification. The inconsistent decision, we believe, it either could be Lawrence or it could be Cleburne. The court has an obligation, or did, and does now, to apply the Cleburne factors, and the court clearly did not apply the Cleburne factors. Davis and Scarborough didn't have to address, really, the standard of scrutiny because they decided for the plaintiffs on other grounds. The majority in Lawrence, through Justice Kennedy, referring to the authors of the Equal Protection Clause and the Due Process Clause, wrote that they knew that, quote, times can blind us to certain truths, and later generations can see that laws once thought necessary and proper serve, in fact, only to oppress.  we should return to the Constitutional law and remember that over the course of history, on occasion, we as a society have lost our footing and our humanity, and eventually we right ourselves, most often through the federal courts. The United States Constitution gives us a backbone and a lodestar in an ever-changing society. It was written for all citizens for all time. It's simple, it's genius, it's dynamic, and most of all, it's humane. It can and must be interpreted to acknowledge a changing society and an emerging recognition that some laws do discriminate against the marginalized, the unpopular, and, in this case, the most vulnerable members of our society. We know better now. There's no reason to treat people this way. We ask that you affirm. Thank you, Ms. Stanier. I think, Mr. Lindstrom, you have some rebuttal. Thank you. Just a few quick points, Your Honor. Our society has a mechanism for change. That's the amendment process. Substantive due process is not a mechanism for change. That's a mechanism for preserving things that are deeply rooted in history. So there's an amendment process that's available at the federal and the state level, and that is the state. For example, at the state level, there were six things on the ballot in 2012 through the initiative process. It's quite common in Michigan. There were six different measures. And that goes to the point that it is the state that has conferred the dignity that was discussed in Windsor. Windsor repeatedly, in discussing the dignity that had been conferred, talked about it being the dignity conferred by the state, and that goes back to the point about democracy, that people confer that dignity by voting for it. And so the right process, if there's going to be change in this area, is not through the courts, but through the people. For example, in Maine, Maine went one way in 2009 where the legislature had passed a law recognizing same-sex marriage. The people rejected it by a referendum, but then in 2012, people reversed course. Could I ask, Mr. Lindstrom, if you have any idea how long it would have taken in the South if the Supreme Court hadn't come with Loving v. Virginia, and what a shock that was down there. Well, Loving, again, violated the Equal Protection Clause itself because it is imposed invidious racial discrimination. The Loving case talks about the fact that that statute was based on the vision of white supremacy. You told me that before. Is the point to be made that the reason that there hasn't been more in the way of analysis of discrimination against gay and lesbian people is because up until just 11 years ago, their conduct could land them in prison in many places. So, you know, you can't say, well, it's not deeply rooted that they have a right to marry because aside from the right to marry, they might have had the sheriff in the hall outside their bedroom trying to find out what they were doing in privacy in their own homes. I take that to be a question about whether it's the right to marry or the right to same-sex marriage, and I think Windsor answers that question. Windsor talks about the history of same-sex marriage and recognizes that it's not deeply rooted. Because the conduct at the basis of same-sex marriage was, until 2003, potentially criminal. Does that not make any difference at all? And then the Supreme Court told us that, in fact, it shouldn't be considered criminal. That's where the almost, I've heard people refer to it as a tsunami of action has occurred, and it was back in that beginning of that period when we had the Michigan Marriage Amendment. Was it not? I mean, I thought we cleared that up. Michigan incurred in 2004. That's correct, Your Honor. But again, Lawrence was about substantive due right to privacy. It's not about public recognition. It was about the fact that that conduct could no longer be considered a crime. And it could no longer jeopardize somebody who engaged in that conduct with the prospect of going to prison. That's true, but this Court also recognized, for example, in Justice O'Connor's concurrence, which wasn't applying the same analysis to marriage, that there's a difference between private conduct and public recognition, particularly when you think about the fundamental right that's being an issue. And this Court has to look at the guidepost that the Supreme Court has recognized. And the reason for that, again, goes back to this importance of democracy in our system. This is something where the most basic right we have as a people is to decide public policy questions on our own. And we can do that by amending the Constitution, but it shouldn't be up to the courts to take these out of the hands of the people. And it seems particularly interesting here, where there does seem to be a particular trend that the society is moving in. This is one of the points in one of the dissents in Windsor, but it recognizes that the victory that's earned through the political process is a truer victory. And it deprives, for example, of an honest victory and an honest defeat in the political process. So this is an issue that's left to the states under our constitutional system, and it's rational for the people to have continued to promote the idea that, in general, it's a good thing if children have both a mother and a father. So we would ask you to recognize the fact that a decision taking this out of the people's hands undermines democracy. It says this is not an issue that reasonable people of goodwill can disagree about. And I think this is an issue reasonable people can disagree about, as you can tell by all the voters in the Sixth Circuit that have weighed in on this issue. Okay, thank you, Mr. Lindstrom. We appreciate both of your sets of briefs and your oral arguments today. Thank you. And the clerk may call the next case.